IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

DANNY B. OVERBAY )
) Case No: 2:09-CV-240
v. ) MATTICE/CARTER
)
MICHAEL J. ASTRUE, )
     Commissioner of Social Security )

## REPORT AND RECOMMENDATION

This action was instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking

judicial review of the final decision of the Commissioner denying the plaintiff a period of

disability, disability insurance benefits, and supplemental security income under Title II and Title

XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, and 1382.  This matter was referred to

the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil

Procedure for a Report and Recommendation regarding the disposition of the plaintiff's Motion

for Summary Judgment (Doc. 8) and defendant's Motion for Summary Judgment (Doc. 10).

For reasons that follow, I RECOMMEND the decision of the Commissioner be

AFFIRMED

### Plaintiff's Age, Education, and Past Work Experience

Plaintiff is a "younger" individual at all times pertinent to his case (Tr. 14, 17, 22).  He

testified that he could not work due to his nerves, explaining that he found it hard to get along

with other people (Tr. 20). Plaintiff completed tenth grade in special education classes (Tr. 26),

and his past job as a truck driver was light and semi-skilled, and a fast food job was light and

unskilled (Tr. 32).

1

## Applications for Benefits

Plaintiff filed his applications for Disability Insurance Benefits (DIB) (Tr. 73-75) and Supplemental Security Income (SSI) on July 26, 2006, alleging disability beginning on June 30, 2006 (Tr. 79-81),   The Agency denied his applications initially (Tr. 40, 41, 44-47) and on reconsideration (Tr. 42, 43, 51-54).  Plaintiff requested a hearing (Tr. 56), and on April 29, 2008, he appeared, represented by counsel, and testified (Tr. 17-29) before Administrative Law Judge (ALJ) Michael J. Davenport.   Plaintiff's grandmother, Emma Jean Overbay, testified (Tr. 29-31), and Cathy Sanders testified as a vocational expert (Tr. 32-36)   On August 18, 2008, ALJ Davenport determined that Plaintiff was not disabled because he could perform a significant number of medium, light, or sedentary jobs that were simple in nature, and did not involve contact with the public (Tr. 9-14).  When the Appeals Council declined review (Tr. 1-4), ALJ Davenport's decision became the Commissioner's final decision in this matter.  20 C.F.R. § 404.961, 416,1481.

## Standard of Review - Findings of the ALJ

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §423(d)(1)(A).  The burden of proof in a claim for Social Security benefits is upon the claimant to show disability.  *Barnes v. Secretary, Health and Human Servs.*, 743 F.2d 448, 449 (6th Cir. 1984); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).  Once, however, the plaintiff makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national

economy which he/she can perform considering his/her age, education and work experience.

*Richardson v. Secretary, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Secretary, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The Court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The Court of Appeals for the Sixth Circuit ("Sixth Circuit") has held that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner*, 745 F.2d at 388 (citation omitted). The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary, Health and Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

After consideration of the entire record, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2009.

2.  The claimant has not engaged in substantial gainful activity since June 30, 2006, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*, 416.920(b) and  416.971 *et seq*.).

3.  The claimant has the following combination of severe impairments: a bipolar disorder  (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: The claimant could perform only simple jobs without exposure to the general public.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on xxxx, xx, 1981 and was twenty-six years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 11-16).

## Issues Presented

Plaintiff raises the following issue: Whether the Commissioner's decision that Plaintiff was not under a disability is supported by substantial evidence.

## Relevant Facts

**A.    Medical Evidence**

Plaintiff went to Preston Hill Counseling and Family Psychology on October 14, 2004, with complaints of "bad nerves."  He reported a history of panic attacks, especially around strangers.  He reported an occupational history as a construction worker and truck driver.  On mental status examination he was assessed to be oriented in all spheres, of below average intellectual ability, agitated, with angry, irritable and anxious mood.  His affect was appropriate but constricted.  He had social anxiety, excessive worry, rumination and irritability.  The diagnostic impression of Dr. Hagen was social phobia and panic disorder without agoraphobia (Tr 192-196).  Plaintiff returned on March 16, 2005.  His chief complaint was for anxiety and depression in relation to family conflict and marital separation without visitation with his son.  Dr. Hagen's diagnosis was social phobia, dysthymia with a history of panic disorder.  He noted Plaintiff had not taken anti-depressant medication for a month and was now unable to be motivated and unable to process emotion.  He exhibited poor attention and concentration and Dr. Hagen suggested immediate resumption of anti-depressants (Tr. 191)

On July 31, 2006, Michael R. Martin, M.D. of Indian Path Pavilion, reported that Plaintiff was taken to the emergency room (Tr. 199).  Plaintiff had suicidal ideations regarding court problems and child support (Tr. 199).  Although Plaintiff had thoughts of shooting himself, Dr.

Martin noted he did not have a gun (Tr. 199). Dr. Martin reported Plaintiff had a history of panic attacks when he was in jail for child support (Tr. 199). He drank five beers prior to this admission (Tr. 199). Dr. Martin started Plaintiff on the medication Seroquel and stated he would discharge him to home after three p.m., and noted that Plaintiff could go back to work (Tr. 200).

On October 18, 2006, Dr. Reed noted Plaintiff had recently been at the Indian Path Pavilion for one day, when he saw Dr. Martin, who placed him on Seroquel (Tr. 221). Because Plaintiff thought that Seroquel interfered with his sleep, he stopped taking it (Tr. 221). Plaintiff told Dr. Reed that his depression was better, that he had no suicidal ideation or intent, was apparently unable to "get his truck back" and was seeking disability (Tr. 221). Although he continued to assess depression, Dr. Reed commented that Plaintiff did not appear severely depressed today (Tr. 222).

On February 26, 2007, Plaintiff saw consultative psychologist William J. Hamil, M.Ed., for a clinical interview and mental status examination (Tr. 243-47). Plaintiff, who was accompanied by his grandmother, drove himself to the appointment (Tr. 243). Dr. Hamil reported that Plaintiff related well to the examiner (Tr. 246). Plaintiff explained his disabilities by saying "my nerves and everything ain't going too great no more. I been fighting it the past five years. I get nervous all the time. If I'd mess up at work I'd get torn up. I'd get down on my self even if I didn't mess up. I stay restless and can't sit still. I constantly pace. I'm irritable and got a short temper." He also reported he "might be bipolar." He reported mood swings (Tr. 243). Plaintiff rated his ability to get along with supervisors and co- workers as "fair" and reported having fair relationships with family members. He reported having a few friends, one of whom he characterized as close (Tr. 246). Dr. Hamil gave a diagnosis of Panic Disorder without

agoraphobia. Plaintiff stated he never shops for groceries, his grandmother does that. He reported he occasionally vacuums and regularly takes out the trash and occasionally does yard work. He demonstrated independence in his daily activities and reported complete independence in bathing, dressing, grooming and eating. Dr. Hamil assessed a fair level of energy and a moderate limitation in his ability to understand and remember general items and concepts because of nervousness and special education history. Dr. Hamil opined that Plaintiff would be able to manage his benefits, if found entitled to them (Tr. 246). Dr. Hamil stated it would be reasonable to expect that Plaintiff would be able to comprehend and follow both simple and somewhat detailed job instructions (Tr. 247). Dr. Hamil rated Plaintiff's current Global Assessment of Functioning (GAF) at 55[1] (Tr. 247).

On February 8, 2007, Dr. Martin identified Plaintiff's presenting problem/complaint as his need for a letter so that he could have a disability evaluation with Wade Smith. Mention is made of a March 15 child support appointment and his being unable to work (Tr. 251). Plaintiff's grandmother told Dr. Martin that Plaintiff had a split personality (Tr. 251). Plaintiff was taking two medications, Celexa and Seroquel, both with a fair response (Tr. 252). Functional impairments noted include making appointments and handling money (Tr. 251, 254). Dr. Martin diagnosed bipolar disorder, NOS (not otherwise specified), and an adjustment disorder with mixed anxiety and depressed mood (Tr. 253). Although he rated Plaintiff's current GAF at 50, he noted that Plaintiff's highest GAF over the past year was 81 (Tr. 253).

---

[1] The Global Assessment of Functioning (GAF) scale considers social, psychological, and occupational functioning on a hypothetical continuum of mental health-illness. A rating between 51 and 60 is indicative of moderate symptoms, or of moderate difficulty in social or occupational functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision,* (DSM-IV-TR), 34 (2000).

Dr. Martin saw Plaintiff for twenty minutes on March 1, 2007 (Tr. 254). Plaintiff reported Lunesta had helped him, but he complained it was too expensive (Tr. 254). Plaintiff had not tried a number of other medications, including Benadryl, or Ambien (Tr. 254). Under the heading "Current Symptoms," Dr. Martin indicated no new problems had been defined (Tr. 254).

On March 8, 2007, state agency reviewing psychologist, Cal VanderPlate, Ph.D., reviewed the record, and filled out a Psychological Review Technique Form (PRTF) (Tr. 257-68). Dr. VanderPlate opined Plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and opined that Plaintiff had suffered one or two episodes of decompensation, each of extended duration (Tr. 267).

On March 8, 2007, Dr. VanderPlate prepared a Mental Residual Functional Capacity (RFC) form (Tr. 271-72). He found no evidence of limitation in three categories: the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with coworkers or peers and the ability to respond appropriately to changes in the work setting (Tr. 272). He found that Plaintiff was "not significantly limited" in twelve of the remaining seventeen areas. Dr. VanderPlate found Plaintiff moderately limited in five areas, including the ability to interact appropriately with the general public and the ability to carry out detailed instructions and to maintain attention and concentration for extended periods of time (Tr. 271-72).

Plaintiff saw Dr. Martin again on June 22, 2007 (Tr. 283-84). Dr. Martin noted Plaintiff was not exercising and not taking Celexa due to an upset stomach (Tr. 283). Dr. Martin planned to terminate Plaintiff from his clinic and refer him to a clinic where he could obtain current

medication therapy.  Plaintiff's current GAF was again assessed as 55 with the past year high of

81 (Tr. 283,284).  On July 9, 2007, Plaintiff called Dr. Martin to report that he had snapped

earlier but that he was "ok" now (Tr. 285).  Plaintiff subsequently missed a court date on either

July 9, or 10 , 2007, due to stress (Tr. 286).

On September 13, 2007, Plaintiff saw Wade Smith, M.S., for a consultative clinical

interview with mental status examination (Tr. 291).  In this report, Plaintiff denied ever having

been arrested (Tr. 291), denied ever having been fired from a job (Tr. 292), and denied that he

had ever attempted suicide (Tr. 292).  Although he presented with an irritable mood, Mr. Smith

reported that Plaintiff did not present as depressed (Tr. 293).  Under the heading, "Cognition,"

Mr. Smith reported that Plaintiff was alert and oriented, and that his attention was intact (Tr.

293).  Plaintiff repeated six digits forward, and three digits in reverse, he quickly spelled "world"

backwards, and he efficiently completed the serial threes task, making one error in six

calculations (Tr. 293).  Mr. Smith opined that Plaintiff's short term memory appeared to be

intact, as did his recent and remote memories (Tr. 293).  Mr. Smith opined that Plaintiff's

numerical reasoning was poor, his visuospatial ability was within normal limits, and Mr. Smith

rated Plaintiff's intelligence as within the borderline range (Tr. 293).

Mr. Smith ruled out various diagnoses, finding that Plaintiff did not meet the criteria for a

major depressive episode, nor did Mr. Smith offer a diagnosis of bipolar disorder (Tr. 293).

Because Plaintiff denied worrying about panic attacks or changing his behavior because of them,

Mr. Smith found that Plaintiff did not meet the criteria for a panic disorder (Tr. 293).  After

reviewing Plaintiff's activities, Mr. Smith commented that he demonstrated normal

psychological independence in his daily activities but noted the sustainability of his activity level

may be occasionally limited by panic attacks (Tr. 294). According to Mr. Smith, Plaintiff performed a moderate range of activities with intact effectiveness and Plaintiff seemed to choose his activities appropriately (Tr. 294). In terms of job effectiveness, Mr. Smith opined that Plaintiff should be able to comprehend and follow both simple and detailed job instructions, and he further opined Plaintiff's concentration and persistence appeared to be adequate to meet the demands of simple or somewhat detailed work-related decisions. Mr. Smith assessed a current GAF of 55 (Tr. 294, 295).

On September 27, 2007, two weeks after Mr. Smith's consultative examination, Tommie S. Slayden, Ph.D., reviewed the examination report and filled out a Psychiatric Review Technique (Tr. 297-310). He assessed Plaintiff to have no episodes of decompensation, each of extended duration (Tr. 307). Dr. Slayden also filled out a Mental RFC Assessment form. Dr. Slayden's opinions are generally similar to the conclusions reached by Mr. Smith. However, Dr. Slayden assessed Plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors as not significantly limited rather than no evidence of limitation. He also assessed moderate limitations in the ability to get along with co-workers or peers and the ability to respond appropriately to changes in the work setting. In spite of those limitations it was his opinion that Plaintiff can understand, remember and carry out simple and detailed tasks. Although he will have difficulty at times with concentration, maintaining attendance, persistence in the work setting and adapting to changes, he should still be able to do these things adequately. Other than not working with the general public, Dr. Slayden assessed no other restrictions due to Plaintiff's mental impairments (Tr. 311-13, 313).

The Record includes evidence submitted by Plaintiff's counsel by letter of November 12, 2007 (Tr. 183-188) related to Plaintiff's academic record which reflects Plaintiff achieved a tenth grade education as a special education student.

On April 21, 2008, Plaintiff's counsel submitted medical records from Bristol Regional Counseling Center which counsel states was for the period July 19, 2007 to January 31, 2008. However, these records also include an assessment from April 20, 2000 (Tr. 318-330). Plaintiff was treated at Bristol Regional Counseling Center on April 20, 2000. The diagnosis was social phobia with a current GAF of 30. The highest assessed GAF in the 6 months before April, 2000 was 51 (Tr. 329-330).

Plaintiff returned to the Center on July 19, 2007. Presenting problems were social/interpersonal (other than family or marital); depression or mood disorder, suicide, attempt, threat, or danger of. No diagnosis was noted. He reported the duration of the problem to be greater than 2 years and less than 5 years (Tr. 327, 328). On October 11, 2007, a case management meeting was conducted. Plaintiff was currently taking Wellbutrin and Seroquel and reported wringing of hands, rages and throwing things. He reported he last held a job two years ago. A case manager was assigned (Tr. 326). A December 20, 2007 record of an office visit indicates Plaintiff was alert and oriented, calm and cooperative, yet anxious with poor eye contact. Under diagnostic impression it indicates a lifelong history of anxiety and a note of "ramifications legally due to child support issues." Anxiety Disorder NOS was assessed. GAF was assessed at 45 on that day. Medications were increased. The Plan was to increase medication to target anxiety, continue working with the case manager, return for med check in 2 to 3 weeks and "may consider referral to vocational rehabilitation" ( Tr. 324, 325). On January 9,

2008 he returned for his scheduled appointment for treatment for anxiety disorder NOS, complicated by arrested emotional development. He reported doing okay at this time on his current medication regime. His court date was scheduled for January 25, which has caused increased anxiety. He requested a letter stating why he could not work. Discussion was had about the issue of work and all agreed that working would likely be possible and actually beneficial for him. Possible options such as "night stocking work" was discussed. There were no diagnostic changes and the plan included a recommendation that further options regarding employment be discussed (Tr. 321, 322). On January 3, 2008, Plaintiff was seen for a routine medication follow-up appointment. He stated things are going well at this time. He denied any specific times of panic attacks or overwhelming anxiety otherwise. He noted that in his spare time he usually goes over to a friend's house and hangs out. He also reports they sometimes go out to bars and may have a drink but denies current issues with alcohol. He still reports some anxiety but denies it has been overwhelming this time. On mental status exam he was generally cooperative and interacted well with the interviewer. He described his mood as "alright I guess." There was no evidence of psychosis and no evidence of suicidal or homicidal ideation. Insight and judgment were grossly intact. Medication strategies were discussed and treatment was expected to improve the health status or function of the Plaintiff (Tr. 319)

**B.**     **Testimony of the Vocational Expert "VE"**

VE Sanders identified Plaintiff's past job as a truck driver as light and semi-skilled, and she rated his job as a fast food worker as light and unskilled (Tr. 32). The ALJ posed a hypothetical question, asking Ms. Sanders to consider a younger individual, who completed tenth grade in special education classes, and had a work background similar to Plaintiff's past work

(Tr. 32). This hypothetical person had no exertional limitations, but was limited to only simple, unskilled jobs that did not require frequent interaction with the general public (Tr. 32). VE Sanders answered that such a person could perform jobs as a janitor/cleaner, stock clerk, groundskeeper, carpenter helper, construction helper, and he could perform miscellaneous sorting jobs (Tr. 32). At least forty-thousand such jobs existed as light work in the region (Tr. 33).

VE Sanders also testified that if Plaintiff's ability to concentrate and to use his memory for work tasks was poor or markedly impaired, then he could not do any jobs (Tr. 33-34). VE Sanders averred that her testimony was consistent with the way that these jobs are described in the *Dictionary of Occupational Titles* (DOT) (Tr. 34).

On cross-examination, Plaintiff's representative asked VE Sanders if her response to the ALJ's hypothetical question would change if she considered the cumulative effect of the five moderate limitations that the state agency reviewing psychologist, Dr. Slayden, set out in Exhibit 18F (Tr. 34, 311-12). VE Sanders replied that she thought the ALJ's limitations, as set out in the hypothetical question, were consistent with Dr. Slayden's limitations (Tr. 34). Therefore, she testified that her answer to the hypothetical question would not change (Tr. 34). VE Sanders, however, did testify that a person who consistently, over a period of years, had GAF ratings of 30-55 would not be able to work (Tr. 35).

## C.    Testimony of Plaintiff

Plaintiff testified  he could not work due to his nerves, explaining that he found it hard to get along with other people (Tr. 20). He stated that when he went to work, he got nervous, he tensed up, and he felt uncomfortable (Tr. 20). When asked to explain why he had left his various jobs, Plaintiff replied that he had quit most of them and that he had been fired from one of them

13

(Tr. 20).  Plaintiff acknowledged that his medications helped him "somewhat" (Tr. 25).  He tried

to explain that statement, but could only say that he was not as depressed as he once felt (Tr. 25).

Plaintiff stated that he still had suicidal thoughts at times and that his medications made him sick

and sleepy (Tr. 26).

In response to questions from the ALJ, Plaintiff testified that he completed tenth grade in

special education classes (Tr. 26).  Although he continued to state that mental problems

constituted his most disabling problems, Plaintiff testified that he had a physical problem, a bad

leg (Tr. 27).  The ALJ asked Plaintiff if he could perform a simple job, that did not require him to

be around a lot of people, and where he would essentially be working by himself (Tr. 27-28).

Plaintiff said that he would have difficulty performing such a job because he did not like to be

alone (Tr. 28).

**The ALJ's Decision**

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since

his alleged onset date, June 30, 2006, and that Plaintiff met the insured status requirements of the

Act through the date of the ALJ's decision (Tr. 11).  At step two, the ALJ identified severe

mental impairments (Tr. 11).  At step three, the ALJ found that none of Plaintiff's impairments,

whether considered singly, or in combination, met or equaled the requirements of one found in

the Listing of Impairments (Tr. 11).  Between steps three and four, the ALJ determined Plaintiff's

residual functional capacity (RFC- what the claimant remains capable of doing, in spite of his

limitations, 20 C.F.R. §§ 404.1545, 416.945).  The ALJ determined that Plaintiff could perform a

full range of work at all exertional levels, but that he could perform only simple jobs without

exposure to the general public (Tr. 12).  The ALJ also determined that Plaintiff's testimony was

not fully credible (Tr. 14). At step four, the ALJ determined Plaintiff could not perform any of his past relevant jobs (Tr. 14). At step five, the ALJ considered Plaintiff's RFC, age, education, and past work experience in conjunction with the testimony of the vocational expert, and determined Plaintiff was not disabled because he could perform a significant number of jobs that accommodated his limitations and existed in significant numbers in the national economy (Tr. 15).

## Analysis

Plaintiff argues the decision of the ALJ was not based on substantial evidence because the ALJ erred in evaluating the severity of his mental impairments, failed to properly consider the effect on his ability to work, and failed to discuss evidence included in the record.

First, Plaintiff alleges the ALJ failed to follow the procedure for evaluating mental impairments as set forth in 20 CFR §§ 404.1520a, 416.920a. He appears to argue the ALJ must evaluate the four "B" criteria and rate a claimant's abilities in each of those four areas (Doc. 9, Plaintiff's Brief 9-12). However, the ALJ did follow the proper procedures and did rate claimant's abilities in each of the four criteria. Plaintiff is essentially arguing the ALJ ignored medical opinions in reaching his opinion. Plaintiff asserts that the ALJ, in making his "B" criteria findings, ignored the opinions of the state agency physicians. Plaintiff refers to the opinion of Dr. VanderPlate, who reviewed the record on March 8, 2007, found that Plaintiff had experienced one or two episodes of decompensation (Tr. 267). However, Dr. VanderPlate rated the other three criteria as mild or moderate. The ALJ and Dr. VanderPlate found that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social

functioning, and moderate difficulties in maintaining concentration persistence and pace (Tr. 12, 267). Thus, the ALJ did not "ignore" Dr. VanderPlate's review. He agreed with three of his four ratings and relied on other conflicting opinions as to whether these were episodes of decompensation.

The ALJ's "B" criteria ratings are consistent with three of Dr. Slayden's four ratings, including Dr. Slayden's finding of no episodes of decompensation or deterioration (Tr. 307). Dr. Slayden and Dr. VanderPlate disagreed with each other on two of the criteria. The ALJ looked at that evidence and weighed it in light of other evidence of record and reached the conclusion plaintiff was not disabled.

Plaintiff next points to the failure of the ALJ to mention the treatment records or diagnoses of Dr. Hagen and failure to mention the GAF of 50 noted by Dr. Hagen (Doc 9, Plaintiff's Brief p. 12). In this case the date of onset for Plaintiff's disability is June 30, 2006. It is true the ALJ did not discuss this evidence but the evidence submitted by Dr. Hagen was from October 2004 to March 2005. Therefore all of that evidence came from a period of time more than a year before Plaintiff alleged disability. In addition, as the Commissioner argues, had the ALJ considered this evidence, he might very well have found that it supported his decision. For example, if Plaintiff was working successfully while seeing Dr. Hagen prior to his alleged onset date, then Plaintiff would have needed to show how his condition deteriorated after that point in time. Arguably, it has not deteriorated. For example, Plaintiff noted that Dr. Hagen diagnosed a panic disorder in October 2004 and noted a history of a panic disorder in his March 2005 notes. Yet, Mr. Smith, who did the most recent evaluation of record in September 2007, opined Plaintiff did not meet the criteria for a panic disorder (Tr. 293). I do not conclude the omission of

16

discussion of this evidence that predates his alleged onset date by some 15 months requires reversal or remand.

Plaintiff next points to treatment at Indian Path Pavilion from January 18-19, 2006 due to suicidal ideations consisting of thoughts of shooting himself. The assessment on admission was rule out bipolar disorder and depressed, depressive disorder not otherwise specified, rule out adjustment disorder with depressed mood, and rule out impulse control disorder with a GAF of 35 (Tr. 197-205). Plaintiff further argues the ALJ appeared to be under the impression it was simply an office visit with Dr. Martin, rather than a hospital admission, and also notes no mention of the GAF assigned or the suicidal ideation. On the other hand, the Commissioner argues Plaintiff overstates the extent of his treatment with Dr. Martin. The ALJ specifically used the word "admission" in the paragraph that described the July 18, 2006 interaction with Dr. Martin. The ALJ noted, "the claimant stated that he had five beers prior to the admission" (Tr. 13). Dr. Martin noted that, although Plaintiff had thoughts of shooting himself, he did not have a gun (Tr. 199). Furthermore, this admission, the only hospitalization of record that occurred after Plaintiff's alleged onset date, lasted only a little more than twenty-four hours, and in his discharge report, in spite of his assessment of a GAF of 35 on admission, Dr. Martin indicated that Plaintiff could return to work (Tr. 200). The records from Dr. Martin, dated July 18-19, 2006, do not support Plaintiff's allegations because they specifically refer to an ability to return to work.

Plaintiff also argues the ALJ failed to discuss the continued treatment by Dr. Martin from June 22, 2007 through July 9, 2007 where there was a diagnosis of bipolar disorder and adjustment disorder with mixed anxiety and depressed mood (Tr. 283-286). The Commissioner

responds to this issue noting the treatment provided by Dr. Martin in February-March 2007, consisted of an intake summary done on February 8, 2007 (Tr. 251). It is not clear whether or not Dr. Martin saw Plaintiff on this date. The intake summary basically repeated information from a recent visit (on January 10, 2007) with Dr. Reed (compare Tr. 251 with Tr. 239) where Plaintiff's grandmother provided most of the information). The other portion of Dr. Martin's "significant treatment" consisted of a twenty minute visit with Dr. Martin that occurred on March 1, 2007 (Tr. 254). Like the reports from Dr. Reed, this report noted Plaintiff's lack of compliance with prescribed medications. Dr. Martin also noted that although Lunesta helped him, Plaintiff found it too expensive (Tr. 254). Otherwise, Dr. Martin reported that Plaintiff had not tried Ambien or Benadryl (Tr. 254). Dr. Martin also stated that during this visit, no current problems were defined (Tr. 254). After that, Dr. Martin planned to see Plaintiff once every six months, and saw Plaintiff again on June 22, 2007 (Tr. 283-86). In June, Dr. Martin recommended terminating Plaintiff from his clinic and referring him somewhere that would supply him with his "CM" (current medications) (Tr. 283). After June 2007, Dr. Martin had a brief phone contact with Plaintiff on July 9, 2007 (Tr. 285). I agree with the Commissioner that these three or four very brief and rather unremarkable reports from Dr. Martin fail to support Plaintiff's allegations of disability and do not require either reversal or remand.

Next, Plaintiff points to the records of Dr. Reed, January 23, 2004 to January 10, 2007. Plaintiff asserts the ALJ did not discuss the reports of Dr. Reed (Doc. 9, Plaintiff's Brief at 13). As the Commissioner argues, Dr. Reed treated Plaintiff for his physical, rather than his mental problems. While Dr. Reed prescribed medications like Wellbutrin, his reports indicate a lack of medication compliance on Plaintiff's part. For example, when Plaintiff saw Dr. Solomon on

18

March 28, 2006 (because Dr. Reed was on vacation), Plaintiff told Dr. Solomon that he had not taken Wellbutrin in months (Tr. 220). On October 18, 2006, Plaintiff told Dr. Reed that he had stopped taking the Seroquel that Dr. Martin had prescribed (Tr. 221). At that same visit, Plaintiff told Dr. Reed his depression had improved, and that he had no suicide intent or ideation (Tr. 221). Dr. Reed agreed that the depression was better (Tr. 221). Dr. Reed submitted two short reports during the relevant period. His report from October 2006, noted the one-day hospitalization in July 2006, and the prescription for Seroquel (Tr. 221). Dr. Reed also saw Plaintiff in January, 2007, when he recorded Plaintiff's statements about improvement in his depression (Tr. 221). This report also included Dr. Reed's observation that Plaintiff did not appear to be severely depressed (Tr. 222). The two reports that Dr. Reed submitted after Plaintiff's alleged onset date do not support Plaintiff's allegations of disability, therefore I conclude any failure to discuss them is harmless error requiring neither reversal or remand.

Plaintiff next argues the ALJ accorded significant weight to the opinion of Dr. William J. Hamil, who saw Plaintiff for a consultative psychological evaluation on February 26, 2007. Dr. Hamil's diagnoses were depressive disorder not otherwise specified, anxiety disorder, not otherwise specified and panic disorder without agoraphobia, with a current GAF of 55. Dr. Hamil opined Plaintiff's concentration and persistence were moderately inadequate to meet the demands of simple work-related decisions; he shows a moderately unsatisfactory ability to interact with others in an appropriate manner; and he is moderately limited in his ability to adapt to changes in the workplace, to be aware of normal hazards, or to take appropriate precaution (Tr. 242-247). Plaintiff points to the fact that the AJL accorded significant weight to the opinion of Dr. Hamil but failed to mention the above limitations in his decision. The Commissioner

responds to this argument suggesting the ALJ adequately summarized Dr. Hamil's consultative examination report (Tr. 13), and accommodated the needs that Dr. Hamil identified in that report (Tr. 12, 14). The Commissioner argues Plaintiff isolates certain passages or statements in the reports and ignores other important statements. Plaintiff asserts the ALJ failed to mention the limitations as set out by Dr. Hamil, including an unsatisfactory ability to interact with others (Doc. 9, Plaintiff's Brief at 14). The Commissioner responds that the ALJ precluded Plaintiff from working with the general public (Tr. 12). In addition, Dr. Hamil reported Plaintiff's comment that he got along with supervisors in a "fair" manner on his past jobs (Tr. 246). Plaintiff notes Dr. Hamil found his concentration and persistence moderately impaired to meet the demands of simple work-related decisions. However, Dr. Hamil also opined that Plaintiff would be able to comprehend and follow both simple and detailed instructions (Tr. 247). By limiting Plaintiff to simple jobs, I conclude the ALJ adequately addressed the limitations found by Dr. Hamil in light of the record as a whole.

Next Plaintiff discusses the March 8, 2007 opinion of a reviewing state agency psychologist, Dr. Cal VanderPlate, pointing to his opinion that Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to interact appropriately with the general public (Tr. 257-274). In making this finding Dr. VanderPlate found plaintiff had one or two episodes of decompensation each of extended duration (Tr. 267). Plaintiff asserts the ALJ "ignored" this opinion. However, the record includes the opinion of another state agency

psychologist, Dr. Slayden, who reviewed the record on September 27, 2008, and opined that Plaintiff had suffered no episodes of decompensation (Tr. 307). The ALJ ultimately agreed with Dr. Slayden's opinion on that issue. As the Commissioner notes, the two state agency reviewing psychologists registered different opinions on this topic; the ALJ had to disagree with one of them. That disagreement does not mean that the ALJ ignored a significant opinion. It is the duty of the ALJ to weigh conflicting opinions in light of the record as a whole.

Plaintiff argues the ALJ ignored the moderate restrictions set out by Dr. VanderPlate, the state agency psychologist, who reviewed the record on March 8, 2007 (Doc. 9, Plaintiff's Brief at 14-15, citing Tr. 257-74). Here, Plaintiff refers to a Mental Residual Functional Capacity Assessment that asks the psychologist to rate the claimant's abilities in twenty mental areas essential to a successful work performance (Tr. 271-72). While it is true that Dr. VanderPlate found Plaintiff moderately limited in five of these twenty areas, Dr. VanderPlate indicating that he found either no evidence of specific limitation or that Plaintiff was "not significantly limited" in fifteen of these twenty areas (Tr. 271-72).

Plaintiff has registered similar concerns about the mental RFC assessment done by Dr. Slayden on September 27, 2007 (Tr. 311-12). Dr. Slayden saw Plaintiff as "markedly limited" in the area of interacting appropriately with the general public (Tr. 312). But the ALJ did not ignore this concern. The ALJ limited Plaintiff to jobs without exposure to the general public (Tr. 12). Otherwise, Dr. Slayden saw Plaintiff as "not significantly limited" in fourteen of the twenty areas measured on the form (Tr. 311-12). In the hearing, Plaintiff's representative asked the vocational expert if the cumulative effect of the moderate limitations set out by Dr. Slayden would preclude Plaintiff from working (Tr. 34). Rather than agreeing with the representative, VE Sanders

replied that she thought the ALJ had accommodated Dr. Slayden's concerns in his hypothetical question (Tr. 34).

Next Plaintiff notes the ALJ failed to mention Plaintiff's school records or the extensive psychological evaluations included with those reports all of which showed him to have learning disabilities that caused him to be in Special Education through the 10th grade.   In this case the ALJ was aware of the fact Plaintiff was in special education classes through the 10th grade based on the testimony of Plaintiff (Tr. 26).  Although the ALJ does not specifically address in detail Plaintiff's educational background or the evaluations found in the record, they were part of the record at the time of the April 29, 2008 hearing.  The ALJ did not ignore the fact Plaintiff was in special education classes. In fact, the ALJ posed a hypothetical question, asking VE Sanders to consider a younger individual, who completed tenth grade in special education classes, and had a work background similar to Plaintiff's past work (Tr. 32).  This hypothetical person had no exertional limitations, but was limited to only simple, unskilled jobs that did not require frequent interaction with the general public (Tr. 32).  VE Sanders answered that such a person could perform jobs as a janitor/cleaner, stock clerk, groundskeeper, carpenter helper, construction helper, and he could perform miscellaneous sorting jobs (Tr. 32). At least forty-thousand such jobs existed as light work in the region (Tr. 33).

Although it may have been a better course for the ALJ to discuss these education records in some detail, I do not conclude that the failure to do so requires reversal or remand under these circumstances.  Plaintiff held several jobs for at least some period of time in spite of his special education status.  Further, the ALJ concluded Plaintiff was a special education student and the

ALJ had several evaluations closer in time and after the date of onset of alleged disability on which to rely in reaching his conclusion that Plaintiff was not disabled.

Finally, Plaintiff notes the ALJ failed to mention Plaintiff's treatment records and treatment from the Bristol Regional Counseling Center, which were also entered into the record after state agency review (Tr. 318-330). In reviewing these records, the oldest one is an Assessment of April 20, 2000, more than 6 years prior to Plaintiff's date of onset. The GAF assessed was 30 with a highest GAF in the last 6 months at 51. That assessment appears to be too remote to require mention by the ALJ. There are records after the date of onset, however. On December 20, 2007 Plaintiff presented reporting "nerve problems." Diagnostic impression was Anxiety disorder NOS cluster c traits noted. He was assessed a current GAF of 45, however, the Plan section of the report includes continue working with case manager, needs to work especially on issues related to self-esteem...and hopefully a return to work (Tr. 324,325). On January 9, 2008, Plaintiff reported he was doing okay at that time on his current medication. He wanted a letter stating "why he can't work." A discussion with the case manager, Jennifer, occurred. All agreed that working would likely be possible and actually beneficial for Plaintiff. They discussed possible options such as night stocking work, which would be around fewer people and would be conducive to his sleep schedule. Plaintiff presented no symptoms of psychosis and showed no change in cognitive functioning. He denied thoughts of suicide or homicide. On that date the Plan included a recommendation that Plaintiff discuss further options regarding employment with Jennifer, his case manager (Tr. 322). In a January 31, 2008 treatment note Plaintiff stated things were going well at that time. He denied any specific times of panic attack or overwhelming anxiety otherwise. He noted that in his spare time he usually

23

does [sic] over to a friends house and "hangs out."  He also reports that they sometimes go out to

bars and may have a drink but denies any current issues with alcohol.  Plaintiff did report some

anxiety but denies it has been overwhelming at this time (Tr. 319).   Once again, it would have

been the better course for the ALJ to mention these evaluations but I do not conclude reversal or

remanded is required in light of the remoteness of the first Assessment and in light of the

references pointing to the ability to work, the benefits of his working and being active socially

which are contained in these records.

Plaintiff cites cases in other Circuits to support his position that the failure to consider all

of the evidence of record requires reversal or remand. Plaintiff notes courts in the First Circuit

have held that "an ALJ may not simply ignore relevant evidence, especially when that evidence

supports a claimant's cause."  *Nguyen v. Chater*, 172 F.3d 31, 35 (1ˢᵗ Cir. 1999); *Suarez v. Sec'y*

*of Health & Human Servs.*, 740 F.2d 1, 1 (1ˢᵗ Cir. 1984); *Dedis v. Chater*, 956 F. Supp. 45, 51 (D.

Mass. 1997); *Diaz v. Sec'y of Health & Human Servs.*, 791 F. Supp. 905, 912 (D.P.R. 1992).

The ALJ is required to consider and evaluate all relevant evidence, whether objective or

subjective, in determining whether a claimant is disabled.  *Cotter v. Harris*, 642 F.2d 700, 704

(3d Cir. 1981); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).  An ALJ must consider all

the evidence and give some reason for discounting the evidence that is rejected.  *Plummer v.*

*Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).

The Seventh Circuit has held that the ALJ's failure to even mention the competent

medical evidence which was contrary to that of other medical evidence, rendered his rationale for

denying the claimant's benefits unacceptable.  *Groves v. Apfel*, 148 F.3d 809, 811 (7ᵗʰ Cir. 1998);

*citing Herron v. Schweiker, 732 F.2d 75, 78-79 (7ᵗʰ Cir. 1984), Jones v. Chater*, 65 F.3d 102, 103

(8th Cir. 1995); *Prince v. Bowen*, 894 F.2d 283, 285-86 (8th Cir. 1990). *See also Lauer v. Apfel*, 169 F.3d 489, 494 (7th Cir. 1999) (stating that "an ALJ must consider all of the evidence and discuss significant evidence contrary to her ruling").

Plaintiff also points to a Fourth Circuit case which supports the view that before a court may find that an ALJ's decision is or is not supported by substantial evidence, the ALJ's decision must analyze all the relevant evidence and sufficiently explain his findings and rationale. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439 (4th Cir. 1997); *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977). The court faces a difficult task in applying the substantial evidence test when the ALJ's opinion does not show that the ALJ properly considered all of the relevant evidence. *See Arnold*, 567 F.2d at 259. Plaintiff points to a Fourth Circuit case which has held that a reviewing court essentially abdicates its duty to scrutinize the record as a whole to determine whether the conclusions reached are rational if it affirms an opinion in which the ALJ has not properly analyzed all the evidence and sufficiently explained the weight given to it. *Id., citing Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

However, I do not conclude that to be the law in the 6th Circuit. In fact, an ALJ is not required to discuss each and every piece of evidence. This Court can consider all of the evidence in the record as a whole and determine if there is substantial evidence in light of all the evidence to support the ALJ's decision. *See Heston v. Commissioner of Social Security, 245 F.3d 528, at 535,536 (6th Cir 2005); Walker v. Sec'y of Health & Human Servs*., 884 F.2d 241, 245 (6th Cir. 1989) (Secretary need not address every piece of evidence in the record); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002) ("Though the ALJ need not address every piece of evidence,

he must articulate, at some minimum level, his analysis of the record so that the reviewing court can follow his reasoning.").   Here the ALJ points to conflicting evidence in some instances. Some of the material he did not discuss is prior to the date of onset.  The failure to discuss the school records does not require remand or reversal because it is remote in time from the date of onset and more importantly, the ALJ in his hypothetical question to the VE assumed Plaintiff did indeed have a history of special education. The ALJ, who stands at the end of the process, has the obligation to consider the entire record evidence and, with the advantage of seeing the entire record including the hearing testimony, make the ultimate decision concerning disability.  It is the province of the Commissioner to weigh the evidence.  *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("The trier of fact has the duty to resolve [the medical evidence] conflict"). While Plaintiff correctly notes that the ALJ did not discuss several documents in the record, I conclude that given the other substantial evidence of record which supports the ALJ's findings regarding Plaintiff's level of mental functioning, coupled with the analysis of the ALJ, any such error was harmless.   It would be futile to require a remand under these circumstances.

## Conclusion

For the reasons stated herein, I conclude there is substantial evidence to support the conclusion of the ALJ and I therefore RECOMMEND the Commissioner's decision be AFFIRMED.

I further RECOMMEND defendant's Motion for Summary Judgment (Doc. 10) be GRANTED, and plaintiff's Motion for Summary Judgment (Doc. 8) be DENIED.[2]

s/William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[2]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).